J-A28037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PATRICK WOLFINGTON, TIMOTHY EARLE AND JOHN GRABOWSKI | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 1564 EDA 2022 |
| THADDEUS BARTKOWSKI, III, CATALYST OUTDOOR ADVERTISING, LLC AND CATALYST EXPERIENTIAL, LLC | : | |

Appeal from the Order Entered April 6, 2022
In the Court of Common Pleas of Chester County
Civil Division at No(s):  2021-05143-CT

BEFORE:  PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                      **FILED JUNE 6, 2023**

Patrick Wolfington ("Wolfington"), Timothy Earle ("Earle"), and John Grabowski ("Grabowski") (collectively, "Appellants") appeal from the order granting a preliminary injunction in favor of Thaddeus Bartkowski, III ("Bartkowski"), Catalyst Outdoor Advertising, LLC, and Catalyst Experiential, LLC (collectively, "Appellees").[1]  We affirm in part, vacate in part, and remand for a correction to the order.

The trial court set forth the factual background of this appeal as follows:

> [Appellants] were employees and members of Catalyst [Outdoor Advertising, LLC and Catalyst Experiential, LLC (collectively, "Catalyst"), of which Bartkowski is the majority

---

[1] **See** Pa.R.A.P. 311(a)(4) (permitting an interlocutory appeal as of right from an order granting an injunction).

owner.[2]] All were parties to the operating agreement as amended for Catalyst. In addition, [Earle and Grabowski] had employment agreements. [Both the operating agreement and employment contracts contained restrictive covenants.[3]] Catalyst's business consisted of various activities [relating to] digital billboards. At one point, Catalyst sold advertising for digital billboards it owned. In addition, and importantly for this litigation, Catalyst's strategy entailed finding locations where digital billboards would create high revenue (and were often not permitted by right) and seeking to acquire an interest in the real estate via lease, easement, or purchase, and obtaining municipal approvals and developing the sites. Catalyst erects monopole billboards, monument billboards (billboards with stone, brick or other surroundings to improve the aesthetics), and experiential billboards (attached to public developments such as dog parks). Catalyst ultimately sells its interest in both the land and the revenue stream from the billboards receiving upfront money as well as a tailing payment (or deduction) depending on performance of the billboard in the two (2) years post-sale.

At times through the history of Catalyst, members and officers were asked to defer salary during periods of low cash reserves or financial difficulty to be repaid after stabilization of [Catalyst]. All [Appellants] testified that there was no specific timeline to be repaid but that the understanding [among] the parties was that repayment would occur when [Catalyst] achieved a financially sound or stable condition. COVID-19 was one such time when the decision was made to defer salary for members and officers following a sale of assets being canceled by a prospective purchaser due to the pandemic. That sale was ultimately

---

[2] Wolfington was one of Catalyst's founders and an executive vice president of real estate; Earle was an executive vice president of investments and became an owner/member in 2020; Grabowski was catalyst's chief financial officer and became an owner/member in 2017.

[3] As detailed below, Appellants were all signatories to a second amendment to a third amended and restated limited liability company agreement ("the amended operating agreement"). The amended operating agreement included a non-compete provision. Earle's and Grabowski's employment agreements contained restrictive covenants not to compete and limiting their uses of confidential information. *See* Employment Agreements, 5/18/15, at § 8, 10.

- 2 -

renegotiated and consummated at a lower price. [In late 2020, Appellants' salaries were deferred.] In May of 2021, [Appellants'] unhappiness with Bartkowski reached its breaking point when [they] discovered that Bartkowski had withdrawn money during their period of salary deferral. [Appellants] and Bartkowski had a meeting, however, no agreement was reached . . .. Other areas of disagreement remained as well and [Appellants] left [Catalyst] and [Appellees] locked [Appellants] out of [Catalyst's] server and email.

Order and Memorandum, 4/6/22, at 3-4 (footnotes omitted). According to Appellees, Grabowski downloaded confidential information from Catalyst's server and Appellants abruptly left Catalyst, leaving Catalyst's operations in disarray. According to Appellants, Appellees constructively terminated and squeezed them out after they confronted Bartkowski about his personal uses of Catalyst's funds and he refused their demands for payments and other conditions on Catalyst's financial and business operations. There is no dispute that by May 2021, Appellants no longer worked at Catalyst. The parties began negotiations to terminate Appellants' stakes in Catalyst but were unable to come to an agreement.

In July 2021, Appellants sued Appellees for breaches of contract, violations of the Pennsylvania Wage Payment and Collection law,[4] and breaches of fiduciary duty, alleging that Bartkowski had mismanaged Catalyst and that Catalyst owed them a total of $1.3 million, which included $555,288

---

[4] **See** 43 P.S. §§ 260.1-260.13.

in deferred salaries or wages and profit distributions.[5] Appellees answered and raised counterclaims for breaches of fiduciary duties, conversion, fraud, and breach of contract. Appellees alleged that Appellants had acted against Catalyst's interests during their employment and that their abrupt departure caused additional harms to Catalyst. Appellees also sought injunctive relief to restrain Appellants from competing against Catalyst.

After their departure from Catalyst, Appellants took steps to create their own company. In their first attempt, they attempted to form a company, MMD Development ("MMD"). Appellants used Catalyst's "deal deck" or "pitch deck," which included materials they took from Catalyst in their pitches for MMD, including Catalyst's business models, examples of completed projects, photographs, and financial analyses of deals, when seeking investors and members. *See* Order and Memorandum, 4/6/22, at 3-4; *see also* N.T., 3/14/22, at 189-90. Additionally, they approached a business contact of Catalyst to fund or participate in MMD, but that company never formed. *See* N.T., 3/14/22, at 189-90. Appellants, however, later formed Wolfgate Devco, LLC ("Wolfgate"), to develop real estate by (1) identifying properties zoned for billboards, (2) obtaining permits, and (3) either selling the permits or developing the site and selling or leasing the billboards. Wolfgate obtained leases or other interest in seven properties in southeastern Pennsylvania.

---

[5] Appellants also filed an emergency petition for the appointment of a custodian of Catalyst based on Bartkowski's alleged mismanagement of Catalyst. The Honorable Mark L. Tunnell denied the petition following a hearing. *See* Order, 9/23/21.

- 4 -

Upon learning of Appellants' new business ventures, Appellees filed petitions for preliminary injunctive relief.[6] The Honorable Bret M. Binder conducted hearings at which Bartkowski, Joe Weinlick ("Weinlick"), Catalyst's new Chief Operating Officer, and Appellants testified. On April 6, 2022, the trial court granted Catalyst a preliminary injunction and, in relevant part, prohibited Appellants from competing against Catalyst in "the Greater Philadelphia Area . . . and New Jersey in leasing, developing, buying, selling, or otherwise participating in real estate transactions and/or development for the purposes of use by a digital billboard[.]" *See* Order and Memorandum, 4/6/22, at 1. The trial court also required Appellants to "destroy any duplicate copies" of digital or physical property of Catalyst. *See id*. Appellants timely appealed and complied with the trial court's order to submit a Pa.R.A.P. 1925(b) statement. The trial court adopted its order and memorandum granting the preliminary injunction as its Rule 1925(a) opinion.

Appellants raise the following issues for our review:

1. Did the trial court err by failing to strictly construe the pertinent restrictive covenants and in interpreting them expansively so as to conclude that [Appellants] violated their terms notwithstanding the evidence that [Appellants] are not engaged in the outdoor advertising business and/or in the out of home media industry?

---

[6] As discovery in the underlying action progressed, Appellees filed three different petitions for preliminary injunctive relief: one on October 19, 2021, a supplemental petition on December 14, 2021, and a third on February 25, 2022.

2. Did the trial court err by granting injunctive relief that is not narrowly tailored, but instead, imposes restrictions in excess of those set forth in the subject agreements?

3. Did the trial court err in concluding [Appellees] proved the existence of immediate and irreparable harm where [Appellees] were unable to identify any actual harm and could only speculate about possible future harm that cannot occur, if at all, until after the expiration of the term of the restrictive covenants and all of which can be fully compensated in monetary damages?

4. Did the trial court abuse its discretion and commit an error of law by failing to conclude that [Appellees] have unclean hands in failing to pay [Appellants] in excess of $1.3 million in salary and profit distributions, in squeezing [Appellants] out of [Catalyst], and by concluding that [s]ection 9(d) of the [a]mended [o]perating [a]greement precludes [Appellants] from asserting unclean hands as a defense?

5. Did the trial court err in ordering mandatory preliminary injunctive relief requiring the destruction of property during the pendency of the action?

Appellants' Brief at 3-5.[7]

This Court reviews an order granting preliminary injunctive relief for an abuse of discretion. *See Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 248-49 (Pa. Super. 2013). Our review is "highly deferential." *Id*. at 248 (internal citations and quotation omitted). An appellate court must examine

_____

[7] We note that Appellees' responsive brief relies almost entirely on a discussion and application of Delaware law, without offering a detailed analysis of whether Delaware law should apply to the issuance of a preliminary injunction, aside from indicating that the amended operating agreement contained a choice of Delaware law provision. *See* Appellees' Brief at 19. We add that Appellees did not mention Delaware standards for issuing a preliminary injunction in any of their three petitions for preliminary injunctive relief, and that they did not do so until part way through the hearings. The trial court did not apply Delaware law, and we decline to so in this appeal.

- 6 -

the record to determine if there were any apparently reasonable grounds for the action of the court below. *See id*. at 248-49. This Court will not inquire into the merits of the underlying controversy. *See id*. at 249. We will only disturb the trial court's decision if it is plain that no grounds existed to support the order or that the trial court relied upon a rule of law that was palpably erroneous or misapplied. *See id*.

It is well settled that "[a] preliminary injunction's purpose is to preserve the *status quo* and to prevent imminent and irreparable harm that might occur before the merits of a case can be heard and determined." *Ambrogi v. Reber*, 932 A.2d 969, 976 (Pa. Super. 2007). A preliminary injunction is an "extraordinary remedy," and the party seeking the injunction bears a heavy burden of establishing:

> 1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; 2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; 3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; 4) that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; 5) that the injunction it seeks is reasonably suited to abate the offending activity; and, 6) that a preliminary injunction will not adversely affect the public interest.

*Allied Envtl. Serv., Inc. v. Roth*, 222 A.3d 422, 426 (Pa. Super. 2019) (internal citation omitted).

Appellants, in their first issue, argue that the trial court erred in construing and applying the restrictive covenants, which, as stated in the amended operating agreement, provided:

No Member shall directly or indirectly engage in any outdoor advertising business of the type in which [Catalyst] historically engaged (the development of traditional sign structures and the sale and marketing of advertising thereon) in the Philadelphia Standard Metropolitan Statistical Area other than through [Catalyst] . . . so long as such Person is a Member of the Company and for a period of one (1) year after such Person ceases to be a Member of [Catalyst]. . . .

Amended Operating Agreement, 1/1/20, § 9(a).

Additionally, Earle's and Grabowski's employment agreements contained the following non-compete provision:

Because of [Catalyst's] legitimate business interest and the good and valuable consideration offered to the Employee, during the term of Employee's employment and for the period of two (2) years following the voluntary or involuntary termination of the Employee's employment with the Employer, the Employee agrees and covenants not to engage in Prohibited Activity within the out of home media industry.

For purposes of this non-compete clause, "Prohibited Activity" is activity in which the Employee contributes his knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to an entity engaged in the same or similar business as the Employer and in the same geographic region in which Employee preformed services for the Employer.[8]  Prohibited Activity also includes

_____

[8] As noted by the trial court, Grabowski's employment agreement did not contain the "in the same geographic region" phrase. **See** Order and Memorandum, 4/6/22, at 6 & n.6; **see also** Grabowski's Employment
*(Footnote Continued Next Page)*

activity that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information.

***See e.g.***, Earle's Employment Agreement, 5/18/15, § 10(b).

Pennsylvania law disfavors restrictive covenants as restraints on trade that undercut an individual's abilities to earn a living. ***See Rullex Co., LLC v. Tel-Stream, Inc.***, 232 A.3d 620, 624 (Pa. 2020). Our courts, however, recognize that "in the modern business environment, such covenants can be important business tools which prevent individuals from learning employers' trade secrets, befriending their customers and then moving into competition with" a former employer. ***Id***. (internal citation, quotation, and bracket omitted). "To be enforceable, a restrictive covenant must be incident to an employment relationship between the parties and supported by consideration; also, its restrictions must be reasonably necessary for the protection of the employer's legitimate interests and reasonably limited in duration and geographic extent." ***Id***. at 624-25 (internal citations omitted). "In essence, the court must examine and balance the employer's legitimate business interest, the individual's right to work, the public's right to unrestrained competition, and the right to contract in determining whether to enforce a restrictive covenant." ***WMI Group., Inc. v. Fox***, 109 A.3d 740, 749 (Pa. Super. 2015) (internal citation omitted).

---

Agreement, 5/8/15, at § 10(b). Appellants do not argue that this difference between Earle's and Grabowski's employment agreements bears any relevance to the disposition of this appeal.

A court will not assume that a contract's language was chosen carelessly, nor will a court assume that the parties were ignorant of the meaning of the language they employed. *See id.* "When a writing is clear and unequivocal, its meaning must be determined by its contents alone. It is not the function of this Court to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used." *See id*. (internal citation omitted).

Appellants argue that the amended operating agreement did not prohibit their activities in real estate development. *See* Appellants' Brief at 29-30. The amended operating agreement, they note, did not expressly preclude activities related to real estate development, and they claim that the trial court essentially rewrote the provision to enjoin their activities.[9] *See id*. at 35-36. Moreover, Appellants contend that the trial court erred by ignoring their evidence that they deliberately chose not to compete with Catalyst in Catalyst's known locations or in Catalyst's specialty in high-cost/high-revenue projects. *See id*. at 39-40.

---

[9] Appellants further suggest Catalyst is no longer in the "outdoor advertising business." *See id*. at 38-39. However, that contention appears to be based on Appellant's overly narrow reading of the outdoor advertising business as limited to the sale of advertising space on Catalyst's billboards. To the extent Appellants argue that any prohibition on working in the "out of home media" industry, as stated in the employment agreements, would apply only to Earle and Grabowski, who signed the agreements, and not to Wolfington, *id*. at 31-32, there is no dispute that Wolfington was an owner/member subject to the non-compete provision in the amended operating agreement.

- 10 -

The trial court found Appellants' attempts to distinguish their real estate activities from Catalyst's outdoor advertising business unavailing. *See* Order and Memorandum, 4/6/22, at 7. The trial court determined that "a significant portion of Catalyst's business is the identification of potential locations for digital billboards, the acquisition of interests in the underlying land, and receiving approvals to construct a digital billboard." *Id*. Appellants' activities, the trial court concluded, "mirror these exactly." *Id*. The trial court thus concluded that Appellees were likely to prevail in their claims against Appellants. *See id*.

Following our review, we discern no error in the trial court's conclusion. The amended operating agreement precluded Appellants from competing in "any outdoor advertising business of the type in which [Catalyst] historically engaged[,]" including, parenthetically, the "the development of traditional sign structures and the sale and marketing of advertising thereon." Amended Operating Agreement, 1/1/20, § 9(a). Nothing in the plain language of the amended operating agreement or the record supports Appellants' argument that this provision was limited to the actual construction of billboards or the sales of advertising space on billboards. Moreover, the record evidence supports the trial court's findings that Appellants engaged in precisely the same activities as Catalyst's historical development of billboards, including acquiring interests in real estate and developing the real estate for outdoor advertising. *See* Order and Memorandum, 4/6/22, at 7-8; *see also* N.T.,

3/14/22, at 8 (indicating Bartkowski's testimony that "Catalyst is in the business of developing, securing real estate for the purpose of developing outdoor advertising assets"). Thus, Appellants' first issue fails.

In their second issue, Appellants claim that the trial court did not narrowly tailor its order. **See** Appellants' Brief at 40. They argue that the trial court should have limited the injunction to areas where their activities would affect an existing Catalyst billboard, and they posit that a prohibition on their activities within one mile of an existing Catalyst billboard is more appropriate. **See id**. at 41. Appellants also assert that the trial court erred when it enjoined their activities in all of New Jersey. **See id**. at 42 (emphasizing that the trial court enjoined their activities in the **entire** state of New Jersey).

Relatedly, Appellants assert that the trial court unreasonably extended the duration of the non-compete provisions. **See id**. Appellants argue that the trial court's preliminary injunction could last indefinitely unless and until the court determined that they had been squeezed out or constructively terminated as of May 2021. **See id**. They claim that the trial court should have set an expiration date should have expired in May 2022, one year from the date they were squeezed out of Catalyst. **See id**.

The trial court did not expressly address Appellants' claims but determined that the preliminary injunction reasonably protected the *status quo* pending the resolution of the underlying controversies between the

parties. *See* Order and Memorandum, 4/6/22, at 3-4. The trial court briefly mentioned that the one- and two-year restrictions in the amended operating agreement and the employment agreements were reasonable and that their geographic scopes were limited. *See id*. at 10-11. The court, however, determined that the duration of an injunction would have to be determined at trial. *See id*. at 11 n.10 (indicating that the parties agreed that Appellants were still owner/members under the amended operating agreement).

As to the geographic scope of the preliminary injunction, the amended operating agreement uses the term "the Philadelphia Standard Metropolitan Statistical Area" and the hearing evidence established that Catalyst operated in the marketing area that included Philadelphia, Bucks, Montgomery, Delaware, and Chester counties in Pennsylvania, and "most municipalities in *South* Jersey . . . somewhat in line with Route 195 . . ." N.T., 3/14/22, at 15 (emphasis added). Therefore, we discern no merit to Appellants' assertion that they were entitled to narrower zones of non-competition than stated in the amended operating agreement and supported by the hearing testimony. However, our review reveals that Appellees, as the petitioning party for preliminary injunctive relief, offered no specific evidence or argument to extend the non-compete provisions to the entirety of the State of New Jersey. Therefore, we agree with Appellants that the prohibition of all of their activities in all of New Jersey is overbroad, and we vacate that portion of the order and

direct the trial court to enter a corrected order limiting the geographic scope of the injunction to southern New Jersey.

As to the duration of the preliminary injunction, we discern no error or abuse of discretion in the trial court's decision not to set an expiration date for the non-compete provisions. Appellants do not argue the non-compete provisions were unenforceable due to the lack of specificity in the duration of the restrictive covenants. We agree with the trial court that the ultimate resolution of the duration of the non-compete provision in the amended operating agreement is a matter for trial on the merits of the parties' substantive claims and counterclaims. *See Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003) (noting that in an appeal from the grant or denial of a preliminary injunction, an appellate court does not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below). Accordingly, we discern no merit to Appellants' claim that the trial court should have issued a preliminary injunction with an expiration date of May 2022.

In their third issue, Appellants assert that Appellees failed to prove a preliminary injunction will prevent immediate and irreparable harm. *See* Appellants' Brief at 43. In order to meet the burden of showing immediate and irreparable harm, a party seeking a preliminary injunction "must present concrete evidence demonstrating actual proof of irreparable harm."

***Greenmoor, Inc. v. Burchick Const. Co., Inc.***, 908 A.2d 310, 314 (Pa. Super. 2006) (internal citation and quotation omitted). A claim of irreparable harm cannot be based solely on speculation and hypothesis and must be shown to be irreversible. ***See id***. Further, the party seeking the preliminary injunction must show that the need for relief is immediate. ***See id***.

Appellants argue that any harms their activities pose to Catalyst are speculative and cannot occur before the expiration of the non-compete provisions. ***See*** Appellants' Brief at 43. In support, Appellants assert that they have yet to construct or sell a sign. ***See id***. They add that given the typical times between obtaining interests in real estate and sales of advertising space, they will not be able to directly compete for advertisements with a Catalyst billboard until after the restrictive covenant in the operating agreement expires. ***See id***. at 45. Appellants emphasize that none of Catalyst's existing assets actually suffered any losses because of their activities. ***See id***. at 46. They thus assert that the trial court erred in granting the preliminary injunction based on the speculative and remote possibility that Catalyst could lose revenue in the future. ***See id***. at 47.

The trial court addressed the irreparable harm requirement for issuing a preliminary injunction and concluded that Catalyst showed that Appellants' activities would result in a loss of business opportunities. ***See*** Order and Memorandum, 4/6/22, at 8-9. The trial court noted that Appellants "have used material, information, photographs and the like obtained from

- 15 -

[Catalyst]" when seeking to form their own business ventures and identified, pursued, and contacted municipalities about digital billboard locations in Catalyst's geographic region. *Id*. at 8. The trial court further credited Appellees' testimony that

> (1) every application for a digital billboard in any municipality makes it increasingly more difficult to receive approval for future billboards; (2) every billboard placed reduces the value of future billboards due to the advertising revenue being less valuable when more competition is located nearby; (3) existing sales by [Catalyst] of certain assets could be reduced due to underperformance during a look-back period for revenues; (4) [Catalyst's] property and trade secrets are being used by [Appellants] to further their business, including the use in a pitch deck of financial analysis, photos, historical performances of [Catalyst], and the like; and (5) damages are too nebulous to ascertain and compensate solely with monetary damages.

*See id*.

Based on these findings, the trial court concluded that Appellees suffered irreparable harm due to

> the reduction in receptiveness to [Catalyst] due to [Appellants'] activities in a region, the value of [Catalyst's] materials used by [Appellants], . . . [and t]he potential impending loss of business or market opportunities due to [Appellants] attempting to receive approvals for digital billboards in municipalities within the geographic reach of [Catalyst].

*See id*. at 8-9 (internal citations omitted).

Following our review, we discern no basis to disturb the trial court's findings of fact or conclusions of law. Catalyst presented testimony, which the trial court accepted, that Appellants' activities in seeking interests in land to develop billboards would adversely affect Catalyst's ability to obtain

- 16 -

approvals for additional billboards in the same area and would diminish the profitability of their existing billboards. **See** N.T., 3/29/22 (A.M.), at 209-10. Because there were apparently reasonable grounds for the trial court's determinations that a preliminary injunction was immediately necessary to prevent irreparable harm, we have no basis to disturb the trial court's ruling.[10]

In their fourth issue, Appellants claim that the trial court erred in rejecting their arguments that Catalyst's failures to pay them their deferred salaries and Bartkowski's unclean hands rendered the amended operating agreement and the employment contracts unenforceable. Additionally, Appellants assert that the trial court erred when rejecting their arguments based on section 9(d) of the amended operating agreement, which states: "[t]he existence of a claim, charge, or cause of action by any Member against [Catalyst] shall not constitute a defense to the enforcement by [Catalyst] of the [non-compete provision]." **See id**. at 50 (quoting Amended Operating Agreement, 1/1/20, at 1/1/20, § 9(d)). However, Appellants do not allege that they received no consideration from these agreements. Appellants' allegations concerning the nonpayment of their deferred salaries and Bartkowski's improper actions are matters that concern breaches of the amended operating agreement and the employment agreements or violations of the law, not the underlying consideration necessary to enforce the

---

[10] To the extent Appellants suggest that the trial court erred in balancing the harms to Catalyst against their need to make a living, we agree with the trial court's statements at the hearing that Appellants were free to develop real estate for purposes unrelated to billboards.

provisions of the underlying amended operating agreement. Therefore, we decline to review the merits of the pending action between the parties, and we discern no basis upon which to disturb the trial court's determination that the underlying facts satisfied the requirements for the issuance of a preliminary injunction. *See Summit Towne Centre*, 828 A.2d at 1000. Thus, Appellants' fourth issue merits no relief.

In their fifth issue, Appellants claim that the trial court erred in ordering them to destroy their copies of the Catalyst's confidential information in their possession. It is well settled that courts will hold mandatory injunctions, which require a positive act to preserve the *status quo*, to a higher standard than prohibitory injunctions, which require a party to refrain from acting. *See Constantakis v. Bryan Advisory Servs., LLC*, 275 A.3d 998, 1021 (Pa. Super. 2022). Thus, this Court will more extensively review the underlying merits of the claims to determine if the party seeking the mandatory injunction has established a "clear right to relief." *Id*. at 1021.

As to the prohibitions on Appellants' use of Catalyst's information, we note that Earle and Grabowski's employment agreements defined confidential information as follows:

> . . . "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any form or medium, relating directly or indirectly to: business practices, methods, policies, plans, research, referral sources, operations, services, strategies, techniques, agreements, contracts, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer

> programs . . databases, manuals, records, . . . graphics, drawings, . . . product plans, designs, styles, [and] models . . ..

Grabowski's Employment Agreement, 5/18/15, § 8(a). The employment agreements prohibited Grabowski from copying "any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of [Catalyst], except as required in performance of . . . authorized employment duties . . .." *Id*. § 8(c). Grabowski's obligations as to confidential information continued "during or after [their] employment until such time as such Confidential Information has become public knowledge . . .." *Id*. § 8(d).

When departing Catalyst, Grabowski sent himself twenty-eight emails attaching Catalyst's files to a personal address, "essentially moving company information to his private account." N.T., 3/16/22, at 61. During discovery, Appellants turned over a hard drive containing 283 gigabytes of information that included Catalyst's financial data and information that came from Catalyst's files. *See id*.; see also N.T., 3/29/22 (A.M.), 154 (indicating Grabowski's testimony that he downloaded files from Catalyst's servers that were eventually placed on the hard drive). Further, the court heard testimony that Appellants had used the information obtained from Catalyst when attempting to form MMD and in other ventures. *See* Order and Memorandum, 4/6/22, at 3-4; *see also* N.T., 3/14/22, at 189-90. The trial court, in fashioning the preliminary injunction, noted its concern about the information,

determined that Appellants should return the hard drive containing Catalyst's files and destroy copies of the files in their possession, but allowed Appellants' counsel to retain copies of the information subject to keeping the information confidential. *See* N.T., 3/29/22 (P.M.), at 7-8.

On appeal, Appellants note the stricter standards applicable to mandatory injunctions than prohibitory injunctions. *See* Appellants' Brief at 53-54. They assert that a prohibitive injunction was sufficient to protect Appellees' interests and that the court's order for them to destroy their copies of Catalyst information was improper because they remained owners/members of Catalyst. *See id*. at 55.

The trial court's order and memorandum did not expressly address the portion of its order requiring Appellants to destroy any personal copies of the information they had taken from Catalyst. Nevertheless, our review of the record, the trial court's findings, and Appellants' arguments compel the conclusion that Grabowski took Catalyst's information and used it outside of the scope of his employment with Catalyst as prohibited by the employment agreement. Thus, Catalyst established a clear right to relief as to the improper taking of its information. *See Constantakis*, 275 A.3d at 1021. Moreover, given the evidence that Appellants had used the information to compete with Catalyst, we conclude that the trial court had a proper basis to order Appellants to destroy their copies of Catalyst's information to maintain the *status quo* between the parties.

In sum, we vacate that portion of the order prohibiting Appellants' activities in all of New Jersey as overbroad and direct the trial court to enter a corrected order limiting the geographic scope of the injunction to southern New Jersey. We otherwise affirm the trial court's order granting Catalyst a preliminary injunction.

Order affirmed in part and vacated in part. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/6/2023